## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RANDOLPH J. MURRAY, | CASE NO. 1:25-cv-00766 |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Randolph J. Murray seeks judicial review of the final decision of Defendant Commissioner of Social Security denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.

### I.        Procedural History

Plaintiff filed his DIB and SSI applications on April 25, 2022, alleging an onset date of April 1, 2021.[1]  (Tr. 10.)  He alleged disability due to lumbar spine degenerative disc disease, sacroiliac joint osteoarthritis, right patella chondromalacia, obesity, depression, bipolar disorder, intellectual deficits, anxiety, and autism spectrum disorder.  (Tr. 17-18, 146, 162, 281.)  His

---

[1] Mr. Murray filed earlier applications for DIB and SSI in November 2019 (Tr. 69), which were denied by an Administrative Law Judge on March 30, 2021 (Tr. 7-27).

1

applications were denied initially and upon reconsideration (Tr. 141-52, 155-70), and he

requested a hearing (Tr. 171-72).  After a hearing (Tr. 35-65), an Administrative Law Judge

("ALJ") issued a decision denying the applications on January 31, 2024 (Tr. 28-34).  On

February 24, 2025, the Appeals Council denied Mr. Murray's request to review the ALJ

decision, making the January 2024 decision the final decision of the Commissioner.  (Tr. 1-6.)

Mr. Murray filed his Complaint on April 16, 2025, challenging the Commissioner's final

decision denying his applications for disability benefits.  (ECF Doc. 1.)  The matter is fully

briefed.  (ECF Docs. 9, 11 & 12.)  Mr. Murray identifies two assignments of error (legal issues)

in his opening brief:

1.      The ALJ erred in her evaluation of Plaintiff's mental functioning.  The ALJ's
        findings regarding social interaction are unsupported by substantial evidence.
        The ALJ improperly evaluated the prior administrative medical findings [PAMFs]
        when failing to comply with the revised regulations.

2.      The ALJ failed to evaluate the persuasiveness of Plaintiff's symptoms pursuant to
        SSR 16-3p.  The ALJ erred when failing to explain how the record shows good
        physical functioning and improvement with treatment, and the ALJ's evaluation
        of Plaintiff's subjective allegations was unsupported by substantial evidence.
        Based upon this characterization of the record, the ALJ relied upon the PAMFs of
        Dr. Holly, and the ALJ failed to comply with the consistency factor of the revised
        regulations.

(ECF Doc. 9.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Murray was born in 1993 and was 27 years old on the alleged disability onset date,

making him a younger individual under Social Security regulations.  (Tr. 22.)  He moved into an

apartment and started living alone in August 2020.  (Tr. 42.)  He has a high school education and

was on an IEP from sixth grade through high school.  (Tr. 43.)  He last worked part time at

Progress Ministries in early 2022, a sheltered workshop in a factory where he packaged and

shipped landscaping bags; he worked with other individuals with disabilities and was assisted by job coaches.  (Tr. 44, 55-56.)  He initially worked about four hours a day, five days a week, but called off work a lot towards the end of his employment because of issues with his back; they started to schedule him for only three days a week.  (Tr. 44-46.)  He said he generally got along well with his coworkers and supervisors but had outbursts and walked out at work every four or five months.  (Tr. 46-47.)

**B.      Medical Evidence**

      **1.      Relevant Treatment History**

            **i.      Mental Health Impairments**

On April 14, 2021, Mr. Murray presented for a follow-up visit with Debbie Marshall, PMHNP-BC at Catalyst Life Services ("Catalyst") for diagnoses of: major depressive disorder, recurrent episode, mild; intellectual disability; autism spectrum disorder; and unspecified insomnia disorder.[2]  (Tr. 382-85.)  He reported that he had been out of Risperdal for about a month, but he had been taking Effexor XR every day.  (Tr. 382.)  He complained that he had not felt like himself for a few weeks; he did not want to talk to anyone, he wanted to stay in bed most of the day, and he had no energy.  (*Id*.)  He reported increased feelings of anger since running out of Risperdal, but he also reported his anger outbursts had improved overall since he moved out of his parents' house in August 2020.  (*Id*.)  It was the first time he had lived independently.  (*Id*.)  He spent most of his days playing video games or on social media.  (*Id*.)  He napped sometimes during the day.  (*Id*.)  He was not working because of his back pain.  (*Id*.)  He rated his overall mood as a 4 on a "10 best scale."  (*Id*.)  On mental status examination, his speech and thought processes were normal.  (Tr. 383.)  He denied suicidal/homicidal ideation and

---

[2] The visit was conducted via telephone due to the COVID-19 pandemic.  (Tr. 382.)

hallucinations.  (*Id.*)  His judgment and insight were fair/good, and his attention/concentration was fair.  (Tr. 384.)  His memory was grossly intact.  (*Id.*)  His mood was described as drowsy.  (*Id.*)  He was cooperative and pleasant and did not sound overtly manic, hypomanic, psychotic, or distressed.  (*Id.*)  NP Marshall continued Effexor XR and restarted Risperdal for major depressive disorder, insomnia, and anger.  (*Id.*)  Mr. Murray declined therapy.  (*Id.*)

Mr. Murray returned to NP Marshall for telepsychiatry appointments in May and June 2021.  (Tr. 386-93.)  During those visits, he rated his mood a 7 on a "10 best scale."  (Tr. 386, 390.)  His anger was improved since starting back on Risperdal.  (Tr. 386.)  On mental status examination, he was calm, cooperative, and pleasant with normal speech and thought processes.  (Tr. 387-88, 391-92.)  His judgment and insight were fair/good, and his attention/concentration was fair.  (*Id.*)  His memory was grossly intact.  (*Id.*)  In June, he reported that he had started part time work.  (Tr. 390.)  As of June, Mr. Murray's major depressive disorder and insomnia were stable, and his anger was improved.  (Tr. 392.)  NP Marshall continued Mr. Murray's prescriptions for Effexor XR and Risperdal and Mr. Murray continued to decline therapy.  (*Id.*)

Mr. Murray attended appointments with NP Marshall approximately once a month through the end of 2021 (Tr. 394-410, 518-24), and saw NP Marshall approximately every other month through July 2022 (Tr. 525-37).[3]  During this period, Mr. Murray's mood was described as "sleepy" or "tired" (Tr. 396, 400, 404, 519, 532), "blah" (Tr. 522, 526), "pain" (Tr. 408), and "mellow" (Tr. 535), but he was also cooperative and pleasant (Tr. 396, 400, 404, 408, 519, 522, 526, 529, 532, 535).  Other mental status examination findings during this period included: normal speech and thought processes (Tr. 395, 399, 403, 407, 519, 522, 526, 529, 532, 535); fair/good judgment and insight (*id.*); fair attention/concentration (Tr. 396, 400, 404, 408, 519,

---

[3] One of Mr. Murray's appointments was with Debra Panke, D.O., also a provider at Catalyst.  (Tr. 530.)

522, 526, 529, 532, 535); fair/good judgment and insight (*id.*); fair attention/concentration (Tr. 396, 400, 404, 408, 519, 522, 526, 529, 532, 535); and constricted (Tr. 408, 519, 522, 526) and full (Tr. 532, 535) affects.

On July 8, 2021, he reported doing "so-so." (Tr. 394.)  He noted struggling with his memory since high school and said he noticed his memory problems most when trying to remember passwords.  (*Id.*)  He did not feel his memory issues interfered with remembering to take his medications.  (*Id.*)  He described his energy as "sometimes good" and "sometimes blah." (*Id.*)  The following month, he continued to report that he was doing "so-so."  (Tr. 398.)  He felt "stressed out," but could not identify what he was stressed about.  (*Id.*)  When he returned for a visit on September 10, 2021, he reported working part-time, four hours a day, five days a week, but said he had been calling off work due to his back.  (Tr. 402.)  He napped during the day at times.  (*Id.*)  During appointments on September 29 and October 27, he again reported that he frequently called off of work because of back pain.  (Tr. 406, 410.)  He also continued to report that he napped at times during the day.  (*Id.*)  On November 30, 2021, Mr. Murray reported he was only working two to three hours, two to three days a week due to issues with his back.  (Tr. 521.)  He reported "getting more frustrated lately," stating his frustration was primarily directed at a brother with whom he had a history of "discord and fighting."  (*Id.*)

Mr. Murray returned to NP Marshall on January 25, 2022, reporting that he had not been able to work for the past two weeks due to his back pain.  (Tr. 525.)  This had him feeling "down."  (*Id.*)  He was attending physical therapy for his back.  (*Id.*)  He also reported that his aunt had committed suicide and he attended her funeral the day before.  (*Id.*)  On March 22, 2022, he saw Dr. Panke.  (Tr. 528.)  He reported that he was still out of work and watched television during the day.  (*Id.*)  He was more irritated over the past several months.  (*Id.*)  He

5

said he was taking Effexor and Risperdal as prescribed, but did not feel Effexor was effective. (*Id.*)  He rated his mood a 6 on a "10 best scale." (*Id.*)  Dr. Panke increased Mr. Murray's Effexor dosage.  (Tr. 530, 531.)  When he returned to NP Marshall on May 5, 2022, he reported feeling less irritable and denied destructive outbursts, but he said he still got angry when playing video games.  (Tr. 531.)  He reported poor sleep due to back pain and napping during the day, and also reported low energy.  (*Id.*)  On July 21, 2022, he reported that he sold his PlayStation the week before and stopped taking his Risperdal because he believed his video games were the cause of his anger and outbursts.  (Tr. 534.)  He denied any worsening of his mood since stopping Risperdal.  (*Id.*)  He was taking Effexor as prescribed and felt it was working.  (*Id.*)  He reported his overall mood was a "6 and a half" on a "10 best scale." (*Id.*)  He lived in Catalyst's income-based housing and received food stamps.  (*Id.*)

Mr. Murray continued treatment with NP Marshall from October 2022 through September 2023, seeing her approximately every two to three months.  (Tr. 364-81, 556-81.)  When he presented to NP Marshall on October 20, 2022, he reported he was doing well and was "the calmest [he had] ever felt." (Tr. 364.)  He denied any recent anger outbursts and said he was sleeping well.  (Tr. 364-65.)  He was taking Effexor XR as prescribed and felt that stopping Risperdal was the right decision.  (Tr. 365.)  He reported right knee pain and having a recent epidural in his back for pain.  (*Id.*)  On mental examination, he was well groomed with average eye contact, normal speech, normal thought process, logical associations, fair judgment and insight, intact memory, intact/fair attention and concentration, "tired" but euthymic mood with full affect, and cooperative/pleasant behavior.  (Tr. 365-68.)  He had a normal gait.  (Tr. 366.)

On January 12, 2023, Mr. Murray reported to NP Marshall that he was doing well from a psychiatric standpoint but his back pain was worse and affected his mood at times.  (Tr. 373.)

6

He rated his mood an "8 on 10 bet scale." (*Id*.) He denied recent anger outbursts, saying they were rare and that anger outbursts were "towards [his] video game." (Tr. 373-74.) He reported sleeping well, but also noted that his sleep had been restless due to his back pain. (Tr. 373.) His examination findings were generally unchanged from his October 2022 visit. (*Compare* Tr. 374-76 *with* Tr. 365-68.) NP Marshall continued his prescription for Effexor XR. (Tr. 377.)

On April 6, 2023, Mr. Murray reported to NP Marshall that he was stable with no new mental health concerns. (Tr. 556.) His sleep was "so-so" and his pain made it difficult for him to get comfortable. (*Id*.) He reported his mood was "ok." (*Id*.) He denied anger outbursts outside of playing video games. (Tr. 556-57.) He rated his overall mood a "7" on a "10 best scale." (Tr. 557.) His examination findings were generally unchanged from his January 2023 visit with NP Marshall. (*Compare* Tr. 557-60 *with* Tr. 374-76.) Mr. Murray's examination findings were again generally unchanged from his recent visits with NP Marshall when he returned to her on June 29, 2023. (*Compare* Tr. 566-68 *with* Tr. 557-60.)

On September 28, 2023, Mr. Murray returned to NP Marshall. (Tr. 574.) He reported that his pain had limited his activity and caused his mood to be low. (*Id*.) He could not work because of his pain and was depressed because he had no money. (*Id*.) His sleep was poor, and he had no schedule during the day. (*Id*.) He rated his mood a "7" on a "10 best scale." (*Id*.) He said he forgot to take his medication at times, but he could not say how often he forgot to do so. (*Id*.) He complained of memory problems, but no gross deficits were observed on examination. (Tr. 576.) On examination, his eye contact was avoidant, and his insight and judgment were fair to poor. (Tr. 575, 576.) Otherwise, his examination findings were generally similar to recent examination findings from visits with NP Marshall. (*Compare* Tr. 575-76 *with* Tr. 566-68.) NP Marshall continued his Effexor XR and Mr. Murray continued to decline therapy. (Tr. 577.)

### ii.     Physical Impairments

On March 7, 2022, Mr. Murray saw Erica L Clinker, APRN-CNP, at Avita Ontario Pain Clinic ("Avita") for low back pain.  (Tr. 480-87.)  He rated his pain level at 8/10 and described the pain as throbbing and sharp.  (Tr. 480.)  He said his pain increased with sitting too long.  (*Id*.)  He denied numbness, tingling, or weakness.  (*Id*.)  He had tried relaxation, ice, heating pads, and over-the-counter pain medication.  (*Id*.)  He completed physical therapy in January 2022.  (*Id*.)  He also tried epidural steroid injections and blocks without relief.  (Tr. 480, 484.)  On examination, Mr. Murray's range of motion in his back was guarded for flexion, extension, and rotation with moderate pain.  (Tr. 483.)  There was tenderness with extension and compression, and along the lumbar facets bilaterally.  (*Id*.)  Faber's, compression, sacral thrust, and distraction tests were negative.  (*Id*.)  Pain was noted in the lumbar area with no radiation.  (*Id*.)  There was no pedal or ankle edema and no noted motor weaknesses in the upper or lower extremities bilaterally.  (*Id*.)  Mr. Murray's gait was antalgic but steady.  (*Id*.)  Reflexes were intact.  (*Id*.)  He was cooperative, alert, and oriented, and was able to answer all questions without difficulty or hesitation.  (*Id*.)  He was diagnosed with chronic pain syndrome and lumbar facet arthropathy.  (*Id*.)  Home exercises and a lumbar MRI were recommended.  (Tr. 484.)  NP Clinker noted gabapentin might be considered in the future; Cymbalta was not recommended.  (*Id*.)

A March 11, 2022 MRI of Mr. Murray's lumbar spine showed mild disc space narrowing at L5-S1, a shallow broad-based protrusion without spinal stenosis or nerve root compression, and stable bilateral foraminal narrowing at this level.  (Tr. 475-76.)  There were no significant degenerative changes and no spinal stenosis at the remainder of the lumbar levels.  (*Id*.)

Mr. Murray continued to treat with NP Clinker and Arjun Sharma, M.D., at Avita during 2022.  (Tr. 418-20, 427-74.)  He saw NP Clinker on April 5, April 26, May 10, August 1, 2022

(Tr. 438, 452, 460, 468) and he saw Dr. Sharma on April 25, May 9, June 3, June 27, August 29, September 29, and December 8, 2022 (Tr. 418, 427, 431, 441, 446, 455, 463).  On April 5, 2022, NP Clinker reviewed Mr. Murray's MRI results and felt that he would benefit from a set of two trial facet blocks and started him on gabapentin.  (Tr. 472.)

On April 25, 2022, Mr. Murray presented to Dr. Sharma.  (Tr. 463.)  On examination, Mr. Murray was pleasant and cooperative.  (Tr. 464.)  A musculoskeletal examination showed that Mr. Murray had moderate difficulty transitioning from sitting to standing and he had an antalgic gait.  (*Id*.)  His lumbar spine showed a flexion biased curve.  (*Id*.)  Palpation revealed tenderness over the lumbar spine and lumbosacral range of motion was limited in extension, right and left rotation, right and left lateral bend.  (*Id*.)  Lumbar facet loading produced pain on the right and left side.  (*Id*.)  There was no deformity to the lumbosacral spine.  (*Id*.)  Faber's test produced pain in the bilateral lumbar spine.  (*Id*.)  There was mild abnormality in muscle tone in the lumbosacral spine.  (*Id*.)  Trigger points were not present in the lumbosacral spine musculature and Mr. Murray's muscle strength was 5/5 in the bilateral lower extremities.  (*Id*.)  Seated straight leg raise was negative in the lower extremity for leg pain radiating to the foot from the low back.  (*Id*.)  Mr. Murray's sensation was intact.  (*Id*.)  Dr. Sharma diagnosed lumbar facet arthropathy and proceeded with a bilateral lumbar facet block at L4-5 and L5-S1.  (Tr. 464-65.)  Mr. Murray presented to NP Clinker the following day, reporting moderate relief following his lumbar facet block.  (Tr. 460.)  NP Clinker recommended a second lumbar facet block and that Mr. Murray continue with gabapentin titration.  (Tr. 462.)

Mr. Murray had his second facet block on May 9, 2022.  (Tr. 457-58.)  He presented to NP Clinker the next day, rating his pain a 7/10 and reporting significant relief from the facet block for about an hour.  (Tr. 452.)  NP Clinker found that Mr. Murray had significant relief of

over 80%, with increased range of motion, decreased pain with provocative maneuvers, and increased ability to perform ADLs after his diagnostic facet block and recommended radiofrequency ablations (RFAs) to the right and left L4-5 and L5-S1.  (Tr. 454.)

An RFA was performed on the left on June 3, 2022, and on the right on June 27.  (Tr. 443-45, 448-50.)  On August 1, 2022, Mr. Murray reported to NP Clinker that the RFA procedures were extremely painful and provided no pain relief.  (Tr. 438.)  An examination of his back revealed that his range of motion was guarded for flexion, extension, and rotation with moderate pain; tenderness was noted along extension, compression, and direct palpation along the lumbar facets bilaterally; there was positive axial loading to the lumbar facets bilaterally, but no paravertebral spasms or trigger points to the lumbar musculature; Faber's, compression, sacral thrust, and distraction tests were negative; and lumbar pain extended into the right low extremity in a L4-5 dermatome fashion, terminating at the right lateral knee.  (Tr. 439.)  There was no pedal or ankle edema in the bilateral lower extremities.  (*Id*.)  Mr. Murray's gait was antalgic but steady with no motor weaknesses to the upper and lower extremities bilaterally and reflexes were intact.  (Tr. 439-40.)  Mr. Murray had stopped taking gabapentin as he felt it was not helpful.  (Tr. 440.)  NP Clinker recommended a right lumbar epidural steroid injection at the L4-5.  (*Id*.)

Dr. Sharma administered the right lumbar L4-5 epidural steroid injection on August 29, 2022.  (Tr. 433.)  Mr. Murray returned to Dr. Sharma on September 29, 2022, reporting moderate relief from his most recent procedure.  (Tr. 427.)  His pain level was 5/10 and worse with walking.  (*Id*.)  Examination showed normal reflexes, a normal gait during neurologic testing but an antalgic gait during musculoskeletal testing, intact sensation, and full muscle strength in his legs but 4/5 strength with right hip flexion during neurological testing.  (Tr. 428.)  A September 2022 lumbar spine CT scan showed no stenosis, mild facet hypertrophy, and a disk bulge at L5-

10

S1 with right lateral recess protrusion, which was a slight change as compared to a disk bulge shown on a March 2022 lumbar spine MRI.  (Tr. 429.)  Mr. Murray was diagnosed with lumbar radiculopathy, lumbar degenerative disc disease, and lumbar spondylosis.  (Tr. 428.)  An EMG was ordered and Lyrica was prescribed.  (Tr. 429.)  Dr. Sharma noted there was worsening of the right lower extremity but that the CT scan did not show any corresponding changes.  (*Id*.)

On November 10, 2022, Mr. Murray underwent an electromyography (EMG) test following complaints of lower back pain radiating to the right leg.  (Tr. 421.)  The EMG study was normal, with no evidence of neuropathy, myopathy, or lumbar radiculopathy.  (*Id*.)

On December 8, 2022, Mr. Murray returned to Dr. Sharma for follow up regarding his EMG results.  (Tr. 418.)  He rated his pain level 8/10 and said his pain was worse with standing and walking and relieved by lying down and hot baths.  (*Id*.)  He denied numbness and tingling but reported right leg weakness.  (*Id*.)  On examination, Mr. Murray was cooperative, with intact reflexes, normal gait on neurologic testing but antalgic gait on musculoskeletal testing, intact sensation, full 5/5 muscle strength in his legs but 4/5 strength with right hip flexion, moderate difficulty transitioning from sitting to standing, tenderness to palpation over the bilateral lumbar spine, limited lumbosacral range of motion, positive facet loading test on the right side, positive Faber's testing in the right lumbar spine and sacral spine, mild abnormality in muscle tone in the lumbosacral spine, positive thigh thrust and modified Gaenslen's on the right, and negative straight leg raises.  (Tr. 419.)  He was diagnosed with sacroiliitis, lumbar spondylosis, and numbness.  (*Id*.)  Dr. Sharma recommended right sacroiliac injection, increased Mr. Murray's Lyrica, started baclofen, and continued venlafaxine (Effexor XR).  (Tr. 420.)

Mr. Murray continued with pain management at Avita during 2023.  (Tr. 411-17, 640-61, 675-728, 784-98, 867-81, 1005-23.)  On March 2, 2023, he saw Dr. Sharma for his back pain.

(Tr. 1006.)  He rated his pain 5/10, saying it was worse with walking and sitting for periods of time and relieved with showers.  (Tr. 1007.)  He reported numbness and tingling in the right knee on occasion.  (*Id*.)  He reported approximately 50% relief for one week from his right sacroiliac injection from January 13, 2023, with his lower extremity numbness "improved significantly ongoing."  (Tr. 1007, 1009-10.)  On examination, Mr. Murray was pleasant and cooperative. (Tr. 1008.)  He had: a normal gait on neurologic examination; an antalgic gait on musculoskeletal examination; intact sensation; full muscle strength in his legs except for 4/5 strength with right hip flexion during neurologic examination; tenderness to palpation over the lumbar spine; limited lumbosacral range of motion in extension, right rotation, right lateral bend; pain on right side with lumbar facet loading; pain in the right lumbar and sacral spine with Faber's testing; positive thigh thrust and modified Gaenslen's on the right; mild abnormality in muscle tone in the lumbosacral spine; negative seated straight leg raise.  (Tr. 1008-09.)  Mr. Murray's diagnoses included lumbar radiculopathy, sacroiliitis, lumbar spondylosis, and chronic pain.  (Tr. 1009.)  Dr. Sharma continued venlafaxine and added nortriptyline.  (Tr. 1010.)  Home exercises were recommended, and Mr. Murray was referred for an evaluation of surgical interventions.  (*Id*.)  The Oswestry Disability Index was completed.  (Tr. 1010.)  Mr. Murray scored a 33, which was consistent with a severe disability.  (*Id*.)

On April 17, 2023, it was noted that lower back and right hip x-rays were unremarkable with no instability identified.  (Tr. 926.)  An April 28, 2023 MRI of the lumbar spine showed no acute lumbar spine abnormalities, mild bilateral L5-S1 neural foraminal stenoses, and L5-S1 posterior disc protrusion.  (Tr. 897.)

Mr. Murray attended physical therapy for pain in April and May of 2023.  (Tr. 799-810, 816-28, 855-66, 882-93, 904-46.)  During physical therapy on April 17, his pain level ranged

12

from 7 to 8/10.  (Tr. 926.)  He reported difficulty: performing work; sustaining static positions; performing activities of daily living; performing prior household management tasks and family care tasks; and performing prior level of exercise, travel, and/or recreational activities.  (Tr. 927.)

On May 8, 2023, Mr. Murray saw Kendra Connell, APRN-CNP, at Avita for his right leg pain.  (Tr. 869.)  He described his pain as sharp and reported numbness, tingling, and weakness in the right leg.  (*Id*.)  He rated his pain level 6/10.  (*Id*.)  He said nothing increased his pain, but his pain was relieved by relaxation and repositioning.  (*Id*.)  Mr. Murray's nortriptyline dosage was increased to 10 mg, and venlafaxine was continued.  (Tr. 872.)

Mr. Murray started treatment with Ryan S. Wagner, M.D., at Avita Bucyrus Orthopedics & Sports Medicine on May 12, 2023, and continued treatment with him through September 2023 for low back pain, sacroiliitis, and pain of the right sacroiliac joint.  (Tr. 662-75, 728-50, 763-78, 828-54.)  At Mr. Murray's initial visit with Dr. Wagner, an EMG/Nerve Conduction Study of the right lower extremity and right hip injection were recommended.  (Tr. 832.)

At physical therapy on May 25, 2023, Mr. Murray reported his pain level was 6/10.  (Tr. 801.)  Mr. Murray returned to NP Connell on June 6, 2023, continuing to report a pain level of 6/10.  (Tr. 786.)  He said that everything increased his pain and nothing relieved it.  (*Id*.)  NP Connell continued Mr. Murray's medications and advised him to continue with his home exercises and physical therapy.  (Tr. 789.)  They planned to see how Mr. Murray was doing after injections with Dr. Wagner before making any changes to his plan of care.  (*Id*.)

On June 23, 2023, Mr. Murray presented to Dr. Wagner for a follow up regarding his pain.  (Tr. 765.)  He reported feeling worse since his initial visit with Dr. Wagner on May 12, 2023, and he rated his pain a 6/10.  (*Id*.)  He was scheduled for an EMG/Nerve Conduction

Study on July 10, 2023, and Dr. Wagner administered a right hip injection.  (*Id*.)  Mr. Murray's

EMG/Nerve Conduction Study was normal.  (Tr. 605-07.)

On August 1, 2023, Mr. Murray presented to Anna Gantz, APRN-CNP, at Avita for his

low back pain, which he described as aching and sharp and rated 8/10.  (Tr. 705.)  On

examination, he was pleasant and cooperative.  (Tr. 706.)  Mr. Murray's neurologic examination

showed an abnormal gait, but his musculoskeletal examination showed him to have a normal

gait.  (*Id*.)  Other examination findings included intact sensation, tenderness to palpation over the

lumbar spine, limited lumbosacral range of motion, pain in the right lumbar spine with Faber's

testing, no abnormality in muscle tone in the lumbosacral spine, and full muscle strength in the

lower extremities.  (*Id*.)  NP Gantz recommended home exercises for Mr. Murray's low back

pain, and she continued his prescription for venlafaxine.  (Tr. 707.)  Mr. Murray refused

nortriptyline and was not interested in NSAIDs or trying gabapentin again.  (Tr. 707-08.)

On September 19, 2023, Mr. Murray returned to Dr. Sharma for his chronic low back

pain.  (Tr. 676.)  He complained of pain radiating into the right lower extremity.  (*Id*.)

Examination findings were similar to those from Mr. Murray's visit in August with NP Gantz.

(*Compare* Tr. 677 *with* Tr. 706.)  Mr. Murray's diagnosis was lumbar radiculopathy and Dr.

Sharma administered a right lumbar L3-4 epidural steroid injection.  (Tr. 678.)

On September 20, 2023, Mr. Murray returned to Dr. Wagner, reporting pain in his groin

with no change in his pain following his right hip injection on June 23.  (Tr. 663.)  He reported a

pain level of 6/10 when in the office and 8/10 when active.  (*Id*.)

On October 3, 2023, Mr. Murray returned to Avita for a pain management appointment

with Miranda Johnson, APRN-CNP.  (Tr. 642.)  He rated his pain 7/10, saying his pain increased

with standing too long and bending but was relieved by relaxation and lying down.  (Tr. 642.)

14

He reported numbness, tingling, and weakness in the right leg.  (*Id*.)  He reported mild relief from his most recent L3-4 epidural steroid injection; about 50% pain relief for one week.  (Tr. 642, 644.)  Examination findings were similar to those from his pain management visits in August and September.  (*Compare* Tr. 643-44 *with* Tr. 677, 706.)  He was advised to continue to follow up with Dr. Wagner and to perform home exercises.  (Tr. 645.)  His venlafaxine was continued.  (*Id*.)  Mr. Murray continued to refuse nortriptyline, NSAIDs, and gabapentin.  (*Id*.)  On October 5, 2023, Dr. Wagner administered a right sacroiliac joint injection.  (Tr. 634-39.)

  **2.**  **Opinion Evidence**

   **i.**  **Mental Health Opinions**

On March 5, 2023, state agency psychological consultant Courtney Zeune, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 97-98) and Mental RFC Assessment (Tr. 101-02).[4]  In the PRT, Dr. Zeune opined that Mr. Murray had moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 98.)  In the Mental RFC, Dr. Zeune opined that Mr. Murray could perform simple and routine tasks of no more than 1-3 steps without strict demands for production and pace, with only occasional and superficial contact with others, so long as his duties remained relatively static and changes could be easily explained.  (Tr. 101-02.)

On reconsideration, on June 19, 2023, state agency psychological consultant Vicki Warren, Ph.D., completed a PRT (Tr. 121-22) and Mental RFC Assessment (Tr. 123-25).  She found Dr. Zeune's PRT consistent with and supported by the evidence and affirmed Dr. Zeune's PRT findings.  (Tr. 121-22.)  She found Dr. Zeune's Mental RFC Assessment partially consistent

---

[4] The prior PRT and Mental RFC Assessment from March 30, 2021, were not adopted due to new and material changes and new diagnoses of autism and intellectual disorder.  (Tr. 98, 102.)

with and supported by the evidence, stating: "Overall limitations and ratings are supported, but narrative changed to be compliant with policy." (Tr. 125.) She opined that Mr. Murray could: recall simple and routine tasks of 1-3 steps; perform simple and routine tasks of 1-3 steps without strict demands for production and pace in a setting separate from others where expectations are consistent and predictable for timeliness, quality, and production of work; interact with the public, coworkers, and supervisors on an occasional brief and superficial basis for work-related tasks only; and carry out a set routine independently despite minor changes in the workplace and major changes would need to be previewed and then gradually implemented to allow Mr. Murray time to adjust to the new expectations. (Tr. 123-25.)

### ii.        Physical Health Opinions

On March 13, 2023, state agency medical consultant Leah Holly, M.D., completed a Physical RFC Assessment. (Tr. 99-100.) She opined that Mr. Murray could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch; and would have to avoid exposure to unprotected heights and hazards. (*Id*.)

On reconsideration, on June 2, 2023, state agency medical consultant Shanker Gupta, M.D., found new and material changes since the prior March 30, 2021 RFC determination. (Tr. 120-21.) But Dr. Gupta also concluded there was insufficient evidence to offer an opinion, noting that Mr. Murray had failed to call to clarify his treatment and conditions. (Tr. 120-21.)

## C.      Hearing Testimony

At a hearing on December 4, 2023, Mr. Murray testified in response to questions from the ALJ and his attorney. (Tr. 42-59.) A Vocational Expert ("VE") also testified. (Tr. 59-63.) The

16

VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 17, 60), could perform representative positions in the national economy, including small products assembler, inspector and hand packager, and routing clerk (Tr. 60-61).

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy. *Id.*

### IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

---

[5] The DIB and SSI regulations cited herein are generally identical. For convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

19

**B.     First Assignment of Error: The ALJ Did Not Err in Evaluating Mental Functioning**

In his first assignment of error, Mr. Murray contends that the ALJ erred in evaluating his

mental functioning because: the ALJ misapplied the Sixth Circuit's holdings in *Drummond v.*

*Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), and *Earley v. Comm'r of Social Security*, 893

F.3d 929 (6th Cir. 2018); the "ALJ's finding that brief and superficial interaction is provided in

non-policy compliant terminology is inaccurate" because courts have found "superficial

interaction is a vocationally relevant term"; the ALJ's reasons for rejecting the state agency

psychological consultants' brief and superficial interaction limitation are not sufficiently

explained or supported by the record; and the ALJ failed to provide any explanation for rejecting

the state agency psychological consultant Dr. Warren's limitation relating to working separately

from others.  (ECF Doc. 9, p. 10-17.)  In response, the Commissioner argues that the ALJ

properly applied Sixth Circuit law as it relates to the prior ALJ's findings (ECF Doc. 11, p. 6)

and properly evaluated the state agency psychologists' opinions when assessing Mr. Murray's

social interaction limitations (*id*. at pp. 7-9).

**1.     The ALJ Appropriately Considered the March 2021 Prior ALJ Decision**

Plaintiff initially argues that "the ALJ erred when finding that he was bound by the prior

ALJ's findings," because "the current legal standard under *Earley* expressly indicates that an ALJ

is not bound by the prior decision's findings."  (ECF Doc. 9, p. 11.)  He further asserts that "[t]he

ALJ's reasoning that he was bound by the prior ALJ's findings requires remand."  (*Id*. at p. 12.)

The Commissioner argues in response that the ALJ did not adopt the prior RFC and properly

complied with Sixth Circuit law when evaluating Mr. Murray's RFC.  (ECF Doc. 11, p. 6.)

In *Drummond*, the Sixth Circuit cited "principles of res judicata" in holding: "Absent

evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the

20

findings of a previous ALJ." 126 F.3d at 841-42. The Social Security Administration then adopted a related Acquiescence Ruling. *See* AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998). But the Sixth Circuit reexamined *Drummond* in *Earley*, clarifying that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'" 893 F.3d at 933 (citations omitted). The *Earley* court therefore found that res judicata does not apply when a claimant applies for a new disability period, but noted that "principles" of res judicata—like "[f]inality, efficiency, and the consistent treatment of like cases"—are still honored when an ALJ "consider[s] what an earlier judge found with respect to a later application and . . . consider[s] th[e] earlier record." *Id.* (citations omitted). The court accordingly held that "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Id.* Further explaining that "[f]resh review is not blind review," the court specified that "[a] later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

Here, while the ALJ stated that he complied with "the principles set forth in *Drummond*" and Social Security's related Acquiescence Ruling when he considered the prior ALJ decision, he then specified that he "largely" adopted the prior decision but "include[d] additional environmental and driving limitations" in the RFC "given the updated medical evidence and testimony of the claimant obtained since the prior [ALJ] decision." (Tr. 10.) He then provided a detailed discussion of the new records and testimony relating to Mr. Murray's impairments (Tr. 14-20) and adopted a new RFC based on the whole record that was notably different from the prior ALJ's RFC (*compare* Tr. 17 *with* Tr. 75).

21

Thus, the record reflects that the ALJ did not improperly find himself "bound by the findings of a previous ALJ" under *Drummond*.  126 F.3d at 841-42.  Rather, consistent with the Sixth Circuit standard articulated in *Earley*, the ALJ performed a "[f]resh review" of the record and "consider[ed] what an earlier judge did if for no other reason than to strive for consistent decision making," 893 F.3d at 934.  The undersigned accordingly finds no procedural error in the ALJ's consideration of the prior ALJ decision.

**2.    The ALJ Sufficiently Explained His Reasons for Not Adopting All of the State Agency Psychological Consultants' Social Interaction Limitations**

Mr. Murray argues that the ALJ erred in analyzing the state agency psychological consultants' opinions regarding his social limitations, and that the mental RFC therefore lacks the support of substantial evidence.  (ECF Doc. 9, pp. 10-17.)  More particularly, he asserts: the "ALJ's finding that brief and superficial interaction is provided in non-policy compliant terminology is inaccurate" because courts have found "superficial interaction is a vocationally relevant term"; the ALJ's reasons for rejecting certain social limitations were not sufficiently explained or supported by the record; and the ALJ failed to provide any explanation for rejecting a limitation to working separate from others.  (ECF Doc. 9, p. 10-11, 12-17.)  The Commissioner responds that the ALJ properly evaluated the state agency psychologists' opinions when assessing Mr. Murray's social interaction limitations.  (ECF Doc. 11, pp. 7-9.)

**i.    Framework for Assessing Medical Opinion Evidence**

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Id*.  Even where an opinion was given great weight under prior regulation, the Sixth Circuit held "there

22

[was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  But where an ALJ's RFC assessment "conflicts with an opinion from a medical source," he "must explain why the opinion was not adopted."  SSR 96–8p, 61 Fed. Reg. at 34478; *see Fleischer*, 774 F. Supp. 2d at 881.

An ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024).  But the ALJ must evaluate the "persuasiveness" of any medical opinions using "factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c.  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important are supportability[6] and consistency.[7]  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5).  The ALJ must explain how he considered consistency and supportability, but need not explain how he considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate

---

[6] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion.  *See* 20 C.F.R. § 416.920c(c)(1).

[7] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.  *See* 20 C.F.R. § 416.920c(c)(2).

findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### ii. The ALJ Properly Evaluated the Medical Opinion Evidence and Adopted Social Limitations Supported by Substantial Evidence

Here, as to Mr. Murray's ability to interact socially, the ALJ found Plaintiff had the RFC to interact occasionally with coworkers and supervisors, but should not be required to interact with the general public. (Tr. 17.) In reaching this conclusion the ALJ considered the record and evaluated the medical opinion evidence, including the opinions of the state agency psychological consultants. As to the state agency opinions specifically, the ALJ explained:

> The undersigned finds the March 2023 and June 2023 opinions of the State Agency psychological consultants, Dr. Courtney Zeune, Psy.D., and Dr. Vicki Warren, Ph.D., at both the initial and reconsideration level to be partially persuasive (B4A, B5A, B9A, B10A). . . .
>
> These opinions are partially persuasive. Although citing to evidence in support of their conclusions, these opinions are not entirely persuasive, as these doctors use non-policy compliant terminology. Further, their conclusions are not entirely consistent with the evidence of record. For example, "brief and superficial" interaction is not consistent with the claimant's testimony that he generally got along with others at his job or his treatment records, which show no indication of social issues on examination (e.g., he was noted to be very pleasant and cooperative). That said, while the specific limitations are not adopted, the undersigned finds persuasive the opinions that the claimant has no more than moderate limitations in all domains find consistency in the records, as no more than moderate limitations are supported by the claimant's overall good mental status examination findings wherein he was observed to be calm, pleasant, cooperative, alert, and oriented, with appropriate fund of knowledge, good judgment and insight, normal thought content, normal speech, intact concentration and attention, normal thought process, logical associations, appropriate mood, appropriate/full affect, good eye contact, normal psychomotor activity, normal behavior, and normal/intact memory (B2F, B3F, B4F, B5F). No more than moderate limitations are also generally consistent with the evidence demonstrating that the claimant has overall good symptom control with treatment.

(Tr. 21-22 (emphasis added).)

Mr. Murray argues "[t]he ALJ's finding that brief and superficial interaction is provided in non-policy compliant terminology is inaccurate, and the Courts have found that superficial

24

interaction is a vocationally relevant term." (ECF Doc. 9, pp. 12-13.)  He also notes that the prior ALJ's RFC included a limitation to "superficial interaction" and the vocational expert was able to understand and respond to hypothetical questions including that limitation.[8]  (*Id*. at p. 13.) While Plaintiff points to cases in which courts deemed superficial interaction a vocationally relevant term, the undersigned has previously explained that the term "superficial" is not defined in the Dictionary of Occupational Titles ("DOT"), the Selected Characteristics of Occupations ("SCO"), or the governing regulations.  *See, e.g., Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases).  Dictionary definitions also do not clearly indicate what specific work-related interactions are considered "superficial" in a vocational context.  *See id.* (quoting *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/superficial). Thus, regardless of whether a VE responds to a hypothetical using the term "superficial," the term itself is not vocationally relevant in that it does not have a clearly defined meaning in the vocational context.  The undersigned therefore concludes that the ALJ did not err by finding the opinions less persuasive due to the use of "non-policy compliant terminology."  (Tr. 21.)

Moreover, the ALJ did not base his persuasiveness finding only on the consultants' use of "non-policy compliant terminology."  Instead, the ALJ explained that the state agency opinions were "not entirely consistent with the evidence of record" because, "[f]or example, 'brief and superficial' interaction [wa]s not consistent with the claimant's testimony that he generally got along with others at his job or his treatment records, which show no indication of social issues on

---

[8] Plaintiff also argues that the ALJ erred by not adopting the prior ALJ's limitation to "superficial" interactions because his functioning has worsened since the prior decision.  (ECF Doc. 9, p. 13.)  This argument conflicts with Plaintiff's earlier argument that it was error for the ALJ to say he was bound by the prior ALJ's decision.  More importantly, the argument is contrary to the Sixth Circuit's decision in *Earley*, where the court rejected *Drummond*'s holding that ALJs are bound by prior ALJ findings "[a]bsent evidence of an improvement in a claimant's condition," 126 F.3d at 841-42, and explained instead that ALJs must perform a "[f]resh review" and "consider[] what an earlier judge did if for no other reason than to strive for consistent decision making," 893 F.3d at 934.  *See* Section IV.B.1.

25

examination (e.g., he was noted to be very pleasant and cooperative)." (Tr. 21.)  Further, while the ALJ acknowledged that he did not adopt all of the consultants' "specific limitations," he agreed with their findings of no more than moderate limitations in all domains, explaining that a moderate level of limitation was supported by "overall good mental status examination findings" as detailed in the opinion and was "consistent with the evidence demonstrating that the claimant ha[d] overall good symptom control with treatment." (Tr. 21-22.)  The ALJ then adopted an RFC that included the state agency consultants' limitation to occasional interactions, excluded the consultants' limitations to "superficial" interactions or "a setting separate from others," and added an additional limitation to no interactions with the general public.  (Tr. 17.)

Mr. Murray argues first that the ALJ's analysis lacks the support of substantial evidence because his presentation to treatment providers does not necessarily reflect how he will behave in a work setting.  (ECF Doc. 9, p. 14 (citing cases).)  But, again, the ALJ did not rely on Mr. Murray's presentation during treatment alone as the basis for his findings.  While the ALJ accurately observed that Mr. Murray's mental status findings consistently showed he presented as calm, cooperative, pleasant, and alert with good eye contact, the ALJ also considered Mr. Murray's own testimony that he got along with others in the workplace and evidence indicating that Mr. Murray had "overall good symptom control with treatment." (Tr. 20, 21-22.)

Mr. Murray next argues that his testimony about getting along with others at work did not provide substantial evidence to support the ALJ's findings because the ALJ did not address Mr. Murray's additional testimony that he was working in a sheltered work environment with a job coach, and because Mr. Murray also testified to difficulties interacting with others at work. (ECF Doc. 9, pp. 14-16.)  A review of the ALJ's decision reveals that he acknowledged the following testimony from Mr. Murray regarding his interactions at work:

26

- He testified that he "for the most part got along with coworkers/supervisors (although he indicated that he did have some verbal outbursts, basically quitting)" (Tr. 18);

- He "testified to some mood instability, which was a problem when he was in school and carried forward to when he was working" (*id.*);

- He testified "that he generally got along with others at his job" (Tr. 21).

Thus, the ALJ acknowledged Mr. Murray's testimony that he got along with others at work, but also that he had some "verbal outbursts" and that his mood instability "carried forward to when he was working." (Tr. 18, 21.)  Plaintiff has not shown that these findings mischaracterized the evidence.  Further, while the ALJ did not discuss all of the testimony cited in Plaintiff's brief, he was not required to discuss all of the evidence but only to consider the evidence as a whole and reach a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  While Mr. Murray is correct that the ALJ did not address the fact that he worked in a sheltered work environment with a job coach, he does not explain how the ALJ's failure to acknowledge those facts negatively impacted or undermined his observation that Mr. Murray had testified to "generally g[etting] along with others at his job." (Tr. 21.)  Given that the ALJ considered the relevant testimony in assessing Plaintiff's social interaction limitations, the undersigned does not find the ALJ's failure to mention the sheltered work environment or the job coach deprived his analysis of the support of substantial evidence.

In his reply brief, Mr. Murray argues that the Commissioner's citation to "individual pages in the record" that align with the ALJ's stated findings amount to "*post hoc* arguments" that should be rejected by this Court.  (ECF Doc. 12, p. 2.)  While the ALJ describes the specific mental status examination findings that he relies on in his analysis, Mr. Murray is correct that he cites generally to the exhibits containing those findings rather than specific pages within the exhibits.  (*See* Tr. 20 (citing B2F, B3F, B4F, B5F), Tr. 22 (same).)  Notably, Mr. Murray does

not assert or identify evidence to show that the mental status findings described and relied upon by the ALJ are inconsistent with those appearing in the records.  Plaintiff has thus failed to show that the ALJ's analysis was inconsistent with or mischaracterized the records he cited and relied upon.  The mere failure to provide pinpoint citations for records that were accurately described does not, in this case, deprive the ALJ's findings of the support of substantial evidence.  *See, e.g., Staib v. Comm'r of Soc. Sec.*, No. 4:23-CV-02353-JDA, 2024 WL 4534261, at \*10 (N.D. Ohio Oct. 21, 2024) (rejecting argument that ALJ's analysis was faulty because ALJ failed to cite to specific pages of specific records, explaining pinpoint citations are helpful, but "there is no legal requirement that an ALJ include pinpoint citations").

Mr. Murray's final challenge to the ALJ's evaluation of the state agency psychological opinions relates to Dr. Warren's opinion that Mr. Murray could work in a setting separate from others.  (ECF Doc. 9, p. 16.)  Plaintiff highlights the VE's testimony that such a limitation would be work preclusive (*id*. (citing Tr. 63)) and argues that the ALJ was required to explain why the limitation was not adopted (*id*. at pp. 16-17).[9]  Where an RFC assessment "conflicts with an opinion from a medical source," Plaintiff is correct that the ALJ "must explain why the opinion was not adopted."  SSR 96–8p 61, Fed. Reg. at 34478.  Here, as discussed above, the ALJ found the opinions were "partially persuasive" due to: their use of "non-policy compliant terminology"; conclusions that were "not entirely consistent with the evidence of record," including Plaintiff's testimony that he generally got along with others at work and treatment records showing "no indication of social issues on examination"; "overall good mental status examination findings";

---

[9] In his reply brief, Mr. Murray asserts that the ALJ's findings as to Mr. Murray's ability to sustain concentration and persistence were in error "even if the ALJ properly evaluated Plaintiff's social interaction abilities."  (ECF Doc. 12, p. 5.)  But Plaintiff's opening brief focuses on the assessment of his ability to interact with others.  (ECF Doc. 9.)  Because this argument is raised for the first time in the reply brief, the undersigned finds that it was waived.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

and "evidence demonstrating that the claimant has overall good symptom control with treatment." (Tr. 21-22.) In this context, the undersigned concludes that the ALJ adequately explained his reasons for not limiting Mr. Murray to work in "a setting separate from others."

For the reasons set forth above, the undersigned finds the ALJ appropriately considered the findings of the prior ALJ under *Earley* and provided an adequate explanation for his findings regarding the persuasiveness of the state agency psychological consultants' opinions. He was not required to adopt the relevant social interaction limitations verbatim, and sufficiently explained his rationale for not adopting those limitations. Further, Mr. Murray did not meet his burden to show that the ALJ's findings lacked the support of substantial evidence. Accordingly, the undersigned finds the first assignment of error is without merit.

**C.      Second Assignment of Error: The ALJ Did Not Err in Evaluating Plaintiff's Physical Functioning**

In his second assignment of error, Mr. Murray contends the ALJ erred in evaluating his physical functioning because: (1) the ALJ failed to properly evaluate Plaintiff's symptoms pursuant to SSR 16-3p; and (2) the ALJ erred in his evaluation of the opinion of state agency medical consultant Dr. Holly. (ECF Doc. 9, pp. 17-25.) The Commissioner argues in response that the ALJ properly evaluated Mr. Murray's subjective symptom complaints and properly evaluated Dr. Holly's opinion. (ECF Doc. 11, pp. 9-12.)

**1.      The ALJ Appropriately Evaluated Plaintiff's Subjective Symptoms**

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that statements of symptoms alone are not sufficient to establish a physical or mental impairment or disability).

29

Under the two-step process to assess the limiting effects of symptoms, the first step is to determine whether there is a medically determinable impairment that could reasonably be expected to produce the symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If there is such an impairment, the second step is to evaluate of the intensity and persistence of the symptoms to determine the extent to which they limit the performance of work-related activities.  *See id*.

In analyzing the second step, an ALJ should consider the objective medical evidence, subjective complaints, information about the claimant's prior work record, and information from medical and non-medical sources.  82 Fed. Reg. at 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Relevant factors include daily activities, types and effectiveness of medications, treatment to address symptoms, and other factors concerning functional limitations and restrictions due to pain or other symptoms.  *Id*.  An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case.  82 Fed. Reg. at 49467.  But the ALJ's analysis "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*.

Here, after detailing the evidence of record, including Mr. Murray's testimony, treatment history, and activities of daily living, the ALJ found that Mr. Murray's "statements concerning the intensity, persistence and degree of limitation associated with these symptoms" could not "reasonably be accepted as consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision."  (Tr. 19.)  The ALJ more particularly explained as it relates to Mr. Murray's physical impairments:

> The record fails to fully substantiate the claimant's allegations of disabling symptoms. Despite the claimant's lumbar degenerative disc disease, sacroiliitis,

30

right patella chondromalacia; obesity, and insomnia, the claimant has retained relatively good physical functioning. A past right knee x-ray was unremarkable (B1F). Further, while diagnostic imaging of the claimant's back revealed some abnormalities, it was generally mild (B1F, B3F). Moreover, a November 2022 nerve conduction study and electromyography was normal and there was no electrodiagnostic evidence of a neuropathy, myopathy or lumbar radiculopathy involving the right lower extremity (B3F, B5F). Moreover, April 2023 x-rays of the lumbar spine were unremarkable (B5F). Further, on examinations, the claimant was observed with normal gait, normal lower extremity strength, no motor weakness, normal range of motion, the ability to heel/toe walk, and intact sensation (B1F, B2F, B5F). Additionally, the record indicates that the claimant's symptoms improved with treatment. Moreover, despite the alleged severity of the claimant's back pain, he testified that he takes no pain medication.

\*\*\*

Thus, the claimant's overall good objective physical and mental status examination findings during evaluations and improvement of symptoms with treatment suggests the claimant is not as limited as alleged and remains capable of performing work within the restrictions set forth herein.

The record also documents the claimant having better functioning than his allegations of disabling symptoms would indicate. The record reflects that the claimant was able to overall tend to his own personal care needs and tend to his activities of daily living, such as preparing meals, doing housework, driving, shopping, managing his money, watching television, handling his own medical care, and attending medical appointments (B2F). He also reported living independently since August 2020. Further, in September 2021, the claimant reported working part-time at Progress Industries since June 2021, 4 hours per day, 5 days per week (B2F).

(Tr. 19-20.)  Mr. Murray raises three challenges to this determination.

First, Mr. Murray challenges the ALJ's finding that he "retained relatively good physical functioning" as reflected in generally mild diagnostic imaging and certain normal physical examination findings (Tr. 19), arguing "the ALJ's finding does not accurately reflect the record" because the record also contains "examinations containing multiple abnormal findings[.]"  (ECF Doc. 9, pp. 18-21.)  In particular, he highlights abnormal examination findings from pain management appointments and appointments with Dr. Wagner that noted: abnormal or antalgic gait; difficulty transitioning from sitting to standing; flexion biased curve of the lumbar spine;

31

positive facet loading, straight leg, log roll, FADIR, Fortin, distraction, FABER, thigh thrust, Ganslen's, ASIS compression, and/or Yeoman's tests; tenderness to palpation; limited range of motion; radiculopathy; pain; and 4/5 strength with right hip flexion.  (ECF Doc. 9, pp. 20-21.)

Although the ALJ did not separately address all of the "20 separate examinations" highlighted in Plaintiff's brief (*id.*), his discussion of the underlying medical records did acknowledge that Mr. Murray's examinations noted: "poor posture, mild abnormality in muscle tone in the lumbosacral spine, moderate difficulty transitioning from sitting to standing, antalgic gait, flexion-based curve of the lumbar spine, limited extension, rotation, and bend of the lumbosacral range of motion, and positive thigh thrust, ASIS compression test, Yeoman's test and Gaenslen's."  (Tr. 18 (citing Exhibits B3F (Tr. 411-96), B5F (Tr. 582-1388).)  As discussed in Section IV.B.2.ii., *supra*, the ALJ was not required to discuss all of the evidentiary findings, but to consider the evidence as a whole and reach a reasoned conclusion.  *See Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507-08).  Further, as also discussed above, the law does not require pinpoint citations to support an accurate description of the medical records. *See Staib* 2024 WL 4534261, at *10.  This is particularly true in a case such as this where—as Mr. Murray highlights in his own brief (*see* ECF Doc. 9, pp. 20-21)—similar examination findings are repeatedly found throughout the lengthy medical record.  Considering that the ALJ accurately acknowledged many of Mr. Murray's abnormal examination findings, in addition to abnormal diagnostic imagery and treatment modalities (Tr. 18), before accurately citing to normal examination findings in support of his conclusion that the complete record does not "fully substantiate the claimant's allegations of disabling limitations" (Tr. 19), the undersigned finds the argument that the ALJ mischaracterized the record is not well taken.

32

Mr. Murray's further argument in his reply brief that the ALJ's "summation of positive and negative objective findings" was insufficient because the ALJ did not explain how those findings "offset[] any of Plaintiff's allegations" (ECF Doc. 12, pp. 5-6) is also not convincing. On the contrary, the undersigned finds the ALJ provided a sufficient explanation for his finding that Mr. Murray's subjective allegations were not consistent with the medical evidence and other evidence of record.  (Tr. 19.)  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  Here, the undersigned concludes that Mr. Murray has failed to show that the ALJ lacked substantial evidence to support his conclusion that "the claimant has retained relatively good physical functioning."  (Tr. 19.)

Second, Mr. Murray challenges the ALJ's findings that "the record indicates that the claimant's symptoms improved with treatment" and that "despite the alleged severity of the claimant's back pain, he testified that he takes no pain medication" (Tr. 19-20), arguing that the findings are "inaccurate."  (ECF Doc. 9, p. 21.)  Specifically, as to the alleged improvement with treatment, Mr. Murray argues "there is no evidence of improvement."[10]  (*Id.*)  And as to Mr. Murray's failure to take pain medication, he argues the ALJ failed to consider evidence that he "did not currently take pain medications because pain medications were ineffective."  (*Id.*)

In support of his argument that the record shows "no evidence of improvement," Mr. Murray cites treatment records showing he subjectively reported pain throughout the relevant period, including records showing: his reported pain was consistently between 6/10 and 8/10; he reported increased pain with activity, including with standing, walking, and sitting; and his

---

[10] Mr. Murray also asserts that his condition worsened since the March 2021 ALJ decision and "the ALJ failed to explain how the adoption of the prior ALJ's findings regarding exertional and postural abilities is warranted under *Earley*."  (ECF Doc. 9, p. 23.) As explained in Section IV.B.1., *supra*, the undersigned concludes that the ALJ complied with *Earley* when he conducted a fresh review of the record evidence and assessed a new RFC.

33

Oswestry Disability Index scores were consistent with his disabling allegations.  (*Id*. at pp. 21-22.)  In essence, Mr. Murray argues there is no evidence of improvement because he continued to report pain without improvement.  But the ALJ was "not required to accept a claimant's subjective complaints" in determining disability.  *Jones*, 336 F.3d at 476.  Here, the ALJ considered his subjective complaints, including allegations that "his back pain [was] constant" and that "the various treatments he has undergone ha[d] provided no relief" (Tr. 18), but noted his diagnostic imagery was "generally mild," that he had certain normal physical examination findings, that his symptoms improved with treatment, and that his activities suggested "better functioning than his allegations of disabling symptoms would indicate" (Tr. 19-20).  Mr. Murray has not shown that the record lacked substantial evidence to support the ALJ's finding that his symptoms improved with treatment, and the record contains evidence that supports the ALJ's finding.  For example, Mr. Murray reported moderate relief following a lumbar epidural steroid injection on August 29, 2022 (Tr. 427, 433), and his providers continued to recommend and administer injections based on records showing 50% relief for one week from a January 2023 injection, with his lower extremity numbness "improved significantly ongoing" (Tr. 1007, 1009-10), and mild relief from an injection in October 2023 (Tr. 642, 644).

As to the ALJ's finding that "despite the alleged severity of the claimant's back pain, he testified that he takes no pain medication" (Tr. 20), Mr. Murray argues that the ALJ "failed to consider that Plaintiff did not currently take pain medications because pain medications were ineffective."  (ECF Doc. 9, p. 21.)  But the ALJ did explicitly acknowledge Plaintiff's allegation "that his back pain is constant and the various treatment he has undergone have provided no relief" before observing that "[d]espite the alleged severity of his back pain, the claimant testified that he takes no pain medication."  (Tr. 18.)  The ALJ also acknowledged that Mr.

34

Murray's "[t]reatment has primarily included physical therapy, injections, radio frequency ablations, medial branch blocks, medications, and following with pain management." (*Id.*)  In this context, the undersigned finds no merit in Plaintiff's argument that the ALJ failed to consider his stated reasons for not taking pain medications.[11]

Finally, Mr. Murray challenges the ALJ's finding that the record "documents the claimant having better functioning than his allegations of disabling symptoms would indicate" (Tr. 20), arguing that the ALJ mischaracterized his testimony regarding the scope of his activities and "failed to explain how [his] limited activities showed greater abilities." (ECF Doc. 9, pp. 23-24.)  But Mr. Murray does not identify evidence that contradicts the ALJ's observations that he "was able to overall tend to his own personal care needs and tend to his activities of daily living, such as preparing meals, doing housework, driving, shopping, managing his money, watching television, handling his own medical care, . . . attending medical appointments[,]" "living independently," and "working part-time . . . 4 hours per day, 5 days per week." (Tr. 20.)  As to the part time work, the ALJ also acknowledged that Mr. Murray "worked on/off at one job" and "did have some verbal outbursts, basically quitting." (Tr. 18.)  Although the ALJ did not specifically discuss all of the details about Mr. Murray's work or activities of daily living that are outlined in Plaintiff's brief, he was not required to do so.  Mr. Murray has not shown that the ALJ's omission of any such information deprived his symptom analysis of the support of substantial evidence.  Importantly, the ALJ did not rely on daily activities alone in his analysis of Mr. Murray's subjective complaints, but also considered his diagnostic imaging, physical examination findings, treatment, and responses to treatment. (Tr. 19-20.)  The undersigned

---

[11] The undersigned also notes there is evidence that Mr. Murray "refus[ed]" pain medications (Tr. 708) and "self discontinued" a medication "against recommendations" (Tr. 707).  In this context, even if Mr. Murray did refuse medications due to perceived ineffectiveness, it would not have been improper for the ALJ to consider Plaintiff's failure to take pain medicine in assessing the consistency of his subjective complaints with the medical records.

35

therefore concludes the ALJ appropriately considered daily activities as one of many factors when assessing the consistency of Mr. Murray's subjective complaints of disabling pain.

For all of the reasons set forth above, the Court finds the ALJ adequately considered Mr. Murray's subjective allegations in the context of the record as a whole, and that Plaintiff has not met his burden to show that the ALJ mischaracterized the evidence or lacked substantial evidence to support his finding that Mr. Murray's statements regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the evidence of record.

### 2. The ALJ Appropriately Evaluated Dr. Holly's Opinion

Mr. Murray's final argument is that the ALJ's analysis of state agency medical consultant Dr. Holly's medical opinion "was based on legal errors and a mischaracterization of the evidence." (ECF Doc. 9, p. 24.)  As to Dr. Holly's opinion, the ALJ explained:

> The undersigned has considered the March 2023 . . . State Agency medical consultant report[] by Dr. Leah Holly, M.D., . . . at . . . the initial . . . level (B4A, B5A . . .). At the initial level, Dr. Holly opined that the claimant could perform light level work except the claimant would be limited to occasional climbing of ramps or stairs, no climbing of ladders, ropes or scaffolds, occasional balancing, occasional stooping, occasional kneeling, occasional crouching, occasional crawling, and must avoid all exposure to hazards. This opinion is persuasive as it is overall consistent with the treating records which indicate overall good physical functioning (such as the claimant being observed on examinations with normal gait, normal lower extremity strength, no motor weakness, normal range of motion, the ability to heel/toe walk, and intact sensation) and the ability to tend to his activities of daily living (B1F, B2F, B5F, Hearing record). It is also supported by citation to specific evidence of record. However, the undersigned has included an additional limitation that the claimant can perform no commercial driving given the overall records available at the hearing level.[12]

(Tr. 20-21.)

Generally citing to the arguments he raised in connection with the subjective symptom analysis, Mr. Murray argues that the ALJ's findings regarding Dr. Holly's opinion lack the

---

[12] Plaintiff does not challenge the ALJ's findings regarding the state agency medical opinion on reconsideration.

support of substantial evidence because the ALJ mischaracterized evidence and/or failed to acknowledge evidence that potentially supported a finding a disability.  (*Id*. at pp. 24-25.)  To the extent that this conclusory and underdeveloped argument is not simply waived, the undersigned finds for the same reasons articulated in Section IV.C.1, *supra*, that Plaintiff has failed to show that the ALJ mischaracterized evidence or failed to address material evidence supporting a finding a disability.  The undersigned further concludes that the ALJ sufficiently and appropriately addressed the persuasiveness of Dr. Holly's medical opinion.

For all of the reasons set forth above, the undersigned finds that the ALJ appropriately considered, evaluated, and articulated his findings regarding Mr. Murray's subjective symptoms complaints and Dr. Holly's medical opinion, and that Mr. Murray has not met his burden to show that the ALJ's findings lacked the support of substantial evidence.  Accordingly, the undersigned finds the second assignment of error is without merit.

## V.      Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

July 27, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).